Good morning, Your Honors, and may it please the Court, Davie Rau for Plaintiff Appellant Marcus Mitchell, who is in the courtroom with us today. In Mitchell 1, this Court explained that it has held time and again that when a person is not committing a serious crime, is not threatening anyone, and is not fleeing or resisting arrest, then it is unreasonable to use more than de minimis force against them. This Court said, quote, unless and until discovery tells a different story, Mr. Mitchell has a Fourth Amendment cause of action against the officers, and these officers are not entitled to qualified immunity. Discovery does not tell a different story. As in Mitchell 1, Mr. Mitchell was suspected only of obstructing a government function and trespassing, both nonviolent misdemeanors. Do we need to look at the context here? I know that came up in the 28J, and it seems to me that matters. At least it's mattered to me as I've been thinking about this case. I mean, if you take the moment in time and you watch that video from, well, you start with the video and you see the protesters in line, that's one thing. But the defendants tell a different story about a series of protests over a series of days that had arguably been escalating, that there had been violence, that there had been failed uses of less than lethal force, that they'd been unsuccessful in doing what they say they're entitled to do under the law. Hasn't discovery told a different story, and doesn't it matter, then, that we're here on summary judgment, whereas earlier we were here on a motion to dismiss? Yes. Judge Kobus, context matters to a point. I'll answer this two different ways. So under bonds, the entirety of the interactions can be considered, and it's true that this Court doesn't look just to the moment of force. So Mr. Mitchell's behavior, how do I think about that? Do we divorce it from the other people that he was involved with, or just the other people who were on the scene at the time? Yes, you do, Your Honor. And that's because… That's the best case for that. Yeah, so there are at least five cases. Mitchell, Bode, Neters, Marks, and Pomachia, sorry, and Locke. All of those cases… How many are eight circuit? Excuse me? How many are eight circuit? All of those are eight circuit. They're cited extensively in our briefing. Locke in a 28-J letter. All of those cases arise in the context of protest environments, and in all of those cases, this Court looks specifically to the conduct of the particular person in question when assessing the reasonableness of the force. In Neters, actually, this Court rejected the argument that defendants are making here, that somehow the broader protest context is relevant to assessing the force. This Court said that defendants focus on the fact that there was hours of criminal activity occurring and that they were under a constant threat of harm, but they can't point to any facts suggesting an immediate threat. And in Locke, this Court said that the fact that a circumstance, a protest environment, can lead to a threat doesn't change the analysis where this Court looks to the individualized defendant and the moment of threat generally. Of course… I thought this was force to arrest. It is. It is force to… It's different than force to protect. Your Honor, it… It's very different. Your Honor, it is. And that's our main argument why Bernini does not apply in this context. In Bernini, the force used was to dispel the crowd and was to, you know, multiple times the Court said this was to dispel the crowd. It was to keep the protest moving west. And, you know, for those reasons, the force that was used was not unreasonable. I think force to disperse and force to restrain through, you know, arrest, I think they're very comparable in this context. Well, Your Honor, the case law does not bear that out. In Bernini, after saying… Any case I was on? Yes, I believe so because… Probably. Because in Pomakea, Your Honor, this Court looked specifically to the plaintiff in question when assessing the force. Again, that's in the same protest that we're talking about here. Back to Bernini briefly. So after the Court says it wasn't unreasonable to keep the protesters moving and stop them from penetrating the police barricade and the line, the Court then actually did have one paragraph of an individualized analysis. It says a couple of the plaintiffs say they were targeted specifically, but those plaintiffs can't point to the defendants in question in that case, and so their claim fails. So even within Bernini, the Court distinguished between force used to dispel and force used on the incident to arrest. We're squarely within that second line of cases. There's no dispute about that, and those cases I mentioned earlier, Mitchell, Bode, Nieders, Marks, Pomakea, and Locke, all do the normal Fourth Amendment analysis in the context of these broader protests. The question is, do the officers face an immediate threat, and the inquiry is individualized to the particular plaintiff? And that's especially true here, if that makes sense, because these officers were not deploying force generally. They specifically targeted Mr. Mitchell with this force. There's no dispute about that. The facts are very clear. And so we fall in that second main category of Fourth Amendment cases. Bernini is an outlier where the force is just used to keep the crowd moving away. So I'll turn. I think we talked a bit about the immediate threat. One thing to say about that is it's from the reasonable officer in the defendant's position, and both Welk and Peel admitted at the time that they fired Mr. Mitchell was not posing a threat. Judge Kubas, you talked about the video. I think that's a great place to start because, you know, Mr. Mitchell was standing still. It was a quiet, relatively calm environment. There's some banter, really, back and forth, and then the officers, just without warning, without telling Mr. Mitchell or others that they're under arrest, just started firing. To the serious crimes inquiry, a reasonable officer and defendant's position would not think Mr. Mitchell was committing a serious crime. Again, the testimony of the officers themselves bears that out. Peel said he never observed Mitchell do anything violent or threatening. That's at Appendix 921, 923, and 24. And he answered trespassing and disobedience of a lawful order when he was specifically asked what laws Mr. Mitchell was violating. Those are the crimes that Mr. Mitchell was charged with, and this Court in Mitchell 1, and in Locke as well, described those as nonviolent misdemeanors or not serious crimes. In a number of this Court's forthcoming... I have to point out, in this circuit, Bernini is not an outlier. It was fundamentally debated beyond a panel, and it's been applied. And don't come in here and say Bernini is an outlier. That was a mistake. I'm sorry, Your Honor. I meant only that it is meant for specific... The circuit would disagree or whatever. No. I agree that Bernini is good law in this circuit. It's more... My point was only that that is for a context when the force is used to disperse a crowd rather than when it is targeted against an individual for arrest, and that is the main body of case law, which we squarely fall under. I think one way of thinking about how Bernini came out was to think about force used to disperse. There's a question about whether that's even a seizure. Judge Kubitz, you just had a recent opinion on that in the Koop case, and Dundrum is the same. So it is clear that these bodies of law are distinct. There's an ancillary question of whether there was a seizure. There's no question in this case whether there was a seizure. I'll turn briefly to the fleeing and resisting arrest prong. Both defendants testified that Mr. Mitchell was not fleeing or evading arrest. That's at Appendix 937 and 523, and again the video shows him standing still when he was shot. Mr. Mitchell's injuries also point in the direction of the excessiveness of the force here. Mr. Mitchell is blind in his left eye. His senses of hearing and smell are irreparably damaged, and he has chronic and debilitating pain on the left side of his face despite many medical procedures. One final point on the analysis on the excessive force is this court pointed out in Locke that this was not a tense, rapidly evolving situation where the need for force may be, where split-second decision-making may point in the direction of force. The court in Locke distinguished that situation, and I would do so here as well. So far you've only attacked the summary judgment ruling? Yes. But the decision was qualified immunity, and that's the only issue on appeal. Well, both issues are on appeal, Your Honor, because the district court— Well, if there's entitlement to qualified immunity— This is not an interlocutory appeal, Your Honor. This is an appeal from the final judgment. So if you win on the first, what do you get? Yes. Well, you know— You lose on qualified immunity. I mean, come on. Yes, Your Honor. We, in our brief, explained this, is that the district court's grant of summary judgment was based entirely on an erroneous reading of the record that credited defendants for— I didn't answer my question. Well, I'm getting to that. Sorry. Come on. Judge Brogan, to answer your question, once you construe the facts appropriately, the defendants are not entitled to qualified immunity. You get there, because now we get to clearly establish— Yes. In Mitchell I, this Court said that time and again this Court has held that when a person is not committing serious crimes, is not threatening anyone, and is not resisting or fleeing, then it is a clearly established constitutional violation to use more than de minimis force against them. And in many decisions since Mitchell, the analysis was the same. So, again, I would point to Locke, Palmaquia— Then we're back to context. No, we're not, Your Honor. Well, yeah. Well— The Supreme Court says we have to be. Well, Your Honor, with respect, there is nothing in this Court's case law that would make officers at the scene who are targeting a particular individual with force, incident to arrest, would make them think that where the person is standing still, is not threatening anyone, and is not committing serious crimes, that they could, without warning, without even telling this person they were under arrest, go ahead and shoot them with lead-filled bean bag rounds. This Court, I think, already answered that question in Mitchell I, and there are many decisions since Mitchell reaffirming— I thought there were warnings here. There were not warnings. There were not warnings, Your Honor. Well, anyone who had been around for the few days would know. It is true that Mr. Mitchell understood himself to be arrestable. He knew that the government perceived him and all of the other water protectors to be trespassing. Now, that's disputed because of treaty interpretation, but it's a very different thing, especially given that the trespass — sorry, excuse me, that the water protectors were there for months. It's a very different thing to be, you know, in some sense subject — I'm sorry, arrestable versus actually under arrest. Is it disputed whether he knew he was under arrest? It is certainly — at most, I would say, Judge Smith, it's a jury question. I don't think there are facts indicating that he at all, indicating that he thought he was under arrest until the moment they, you know, started firing and actually restrained him, because there's nothing in the record that they said, you know, you're under arrest, put your hands up. And Ms. Clemente Palmaquia recently pointed that out, again, in the subject of the same protest, that that was a relevant factor in the analysis of the force. So I'm cutting into my rebuttal time, so I'll be back shortly. Thank you. Mr. Grinnells? May it please the Court, Counsel. My name is Sean Grinnells. I'm here representing the defendant appellees Morton County, Morton County Sheriff Kyle Kirkmeyer, and Bismarck Police Officer Tyler Welk, and Morton County Deputy George Peel. I'll be splitting the 50-minute argument today with counsel for State Defendant North Dakota Highway Patrol Captain Ben Connelly with James Portello. I will have 11 minutes. She will have four minutes. So I just want to start by addressing many misstatements of the records I just heard opposing counsel's state to this Court. Complete mischaracterization of the evidence in this case. A discovery in this case did reveal a different story than what this Court was presented on the Rule 12 dismissal. Remand, this Court ruled on previously in this case. In this case, there's evidence of all four of the Graham factors by Mr. Mitchell in this case. Seriousness of the crime, threat to the safety of officers, evading arrest, and resisting arrest. So as to each of those, let's start with evading and resisting arrest. And just overall, the facts of this case, we have video of what occurred on that bridge that night. The bridge was clearly closed to all traffic and all pedestrians. The officers had this barricade across the north end of the bridge and had repeated warnings to protesters that night to get off the bridge and get off the barricade. Mr. Mitchell was observed on that barricade. Purposely alleged crime. Multiple alleged crimes. So he was charged with obstruction and trespassing. Those were all. Was he charged with any crime higher than a nonviolent misdemeanor? Not charged. But there is evidence the crimes that he was observed being, conducting that night do involve felony conduct. And I'll get to that now. So the crimes are criminal trespass, which is a misdemeanor, engaging in a riot, which is the different levels. Just engaging in the riots is Class A misdemeanor. But if on the engaging in a riot, if you actually incite or urge five or more persons to engage in the riot, that becomes a Class C felony. If you actually give commands or instructions, it's a Class B felony. Or if there's more than 100 people involved in the riot, then it's a Class B felony also. Whether or not you gave commands or not. In this case, there's evidence of Mr. Mitchell at the forefront of the protesters with a small group that are negotiating with officers to get the protesters to leave the bridge peacefully. There's testimony from the commander on the scene, Ben Connelly, and Jason Stuglemire, who was with him. He was with the SWAT team that night from Bismarck PD, negotiating with the protesters, telling them you've got to get off the bridge. Mr. Mitchell told Lieutenant Stuglemire to fuck off. There's also evidence of Mr. Mitchell and all the protesters being pushed across this bridge with the use of force by officers using less lethal beanbag rounds. Multiple arrests being made. Mr. Mitchell testifying, he was always trying to stay ahead of the officers during these pushes. So he's running off, and you see him in the camera. We've got video citations in our briefs. Mr. Mitchell running ahead of the officers, keeping ahead of them. Is there a felony? Yes. The facts in the case, I believe it can establish two felonies here. One is inciting a riot. Is that something that would need to be resolved factually? I mean, apparently there's dispute as to whether the conduct in question arose to the level of something beyond nonviolent misdemeanors. So we're here on summary judgment. This is where the evidence is presented. This is the case that's presented. And the facts that are in the record right now that aren't disputed, that he was running ahead of the officers during these pushes across the bridge, that's not in dispute. It's not disputed that after each push, as law enforcement retreated back north of that barricade, Mr. Mitchell is observed in the video being the first or maybe the second protester climbing back up on top of that barricade with all the other protesters following thereafter. There's no dispute in this case that Mr. Mitchell, in this video of this, the events leading up to the shots being fired where he's injured, there's no dispute that he's standing in front of, as part of, an organized protester shield wall on the bridge confronting a parallel police line. Mr. Mitchell testified his intent in doing that was to not allow the officers to proceed any further to go into the protester camps. And you say that's inciting a riot. That's sufficient. So all you have to do is urge other people to engage in a riot. If he's at the front negotiating with officers about, no, we're not going to leave this bridge, if he's also standing in front of the shield wall, Sergeant Officer Peel was instructed by a commanding officer on the scene, a higher ranking officer on the scene, that's the person we need to arrest. He conveyed that information to Officer Weld. So what was the other felony? You said inciting a riot and what? The facts in this case, he was never charged with this, but the facts of what he was observed doing there would fall within the definition of terrorizing under North Dakota law. And the elements of that claim are a person is guilty of a Class C felony if, with intent to place another human being in fear for that human being's or another's safety, or otherwise causes serious disruption or public inconvenience, or in reckless disregard of risks of causing such terror, disruption, inconvenience, the person threatens to commit any crime of violence or act dangerous to human life. We have testimony in this case from Officer Peel and Weld. They both testified when they're in the parallel police line facing off against this organized protester's shield wall. They felt threatened. They felt fear for their safety. Officer Peel testified that, I saw Mitchell standing there holding his shield. Two nights prior at this very location, Peel had another protester throw his shield at him. If we disagree that, I'm not saying we do, but if we were to disagree that these were felonies or that they're facts sufficient to prove felonies, do you lose at that point or is there another argument that you've got? So as I mentioned, there's actually, in this case, I believe there's evidence that supports all four of the Graham factors for use of more than de minimis force. So we were just talking about the seriousness of the crimes. The seriousness of the threat to safety is what I was just talking about, how they observed him holding the shield, which they perceived to be a weapon. Who knows what's behind that shield? There are reports of... Are you going to get to answer the question? He was asking if there was other basis. If you lose on the felony point, do you lose? No, we don't lose. And that's what I was getting at. I'm going to answer that, yeah. Sure. We don't lose because under the Graham factors, that's only one of the four. All you have to do is establish one of the four and you can use more than de minimis force. Here we also have evading and fleeing arrests. I was talking about how Mitchell's repeatedly shown in the videos running and he admits he was trying to stay ahead of the officers during these law enforcement pushes. He admits he saw officers using force against other protesters in multiple arrests occurring. Have you heard it? Because I think there was something referencing Officer Peel responding that was Mitchell running away and his answer is no. No, what opposing counsel was arguing is that during his deposition, he was asked a specific question. At the moment he pulled the trigger, was he running and fleeing away? Well, no, he wasn't running or fleeing away. He was standing there holding the shield as part of the police wall. By the way, he was running and fleeing multiple times during the prior pushes by law enforcement leading up to this. And so that's another one of our arguments is that the officers was effected. When force was used, he wasn't running. He was standing there in the police wall and the officers perceived him as getting ready to fight us. It seems like the way you're arguing, my question to your colleague on the other side, was whether we focus on him individually or whether the context as far as the group matters. You're arguing a lot about what the plaintiff himself was doing. Do you agree with her that we need to focus on his actions individually here in applying the Graham factors? I think you can do both in this case. And what case allows us to look more broadly? Two cases. Bernini case I think is very much on point on this case. In Bernini, you had the Republican National Convention downtown, a no-go zone. But doesn't it matter that that was a Rappel case? But it wasn't just a Rappel case. And Rappel attempted to arrest a person? Just to clarify, the Bernini case wasn't just a dispersal case. There was no discussion about whether this is a Fourth Amendment seizure or not. The whole question is whether it was excessive force because they were using the force to direct the crowd west down Shepard Road to a park where they could effectuate arrests. They encircled them there at Shepard Park because there was no space on Shepard Road with a number of protesters. That's what Bernini was talking about. It was force incident to an arrest. They were funneling the protesters to a park to process them for arrest purposes. So that's exactly what we're talking about here, too. So in our case, it's even better than Bernini because our officers are witnessing him engaging, him personally engaging in crimes in their very presence, whereas in Bernini, the question is, well, did you have probable cause to apply force to everybody in the crowd? Because some of them were starting to comply when you applied force. And the court noted properly in that case, well, no, it was properly used force in that case because some of the protesters in the crowd turned to face the officers. So our case is even better than that because we actually have Mitchell himself observed turning and facing the officers, not complying with officer commands one bit. So also, PO testified that he interpreted Mitchell's holding his shield in that police line as being active resistance. Mitchell had already observed the officers pushing and arresting people multiple times across this bridge. He makes his last stand there on the bridge holding his shield. And so his holding his shield is also active resistance to an arrest. So, you know, I think we have evidence here of all four of the Graham factors. We only need one. As far as the cases that the plaintiff cites as supposedly supportive of her position, if you look at each of the cases she's talking about, those are situations that don't involve a crowd acting as a unit, or there's some aspect to the crowd where, for instance, the Nieder's case she cites. In Nieder's, it's a photojournalist. And the record showed in that case the photojournalist had actually left the scene after dispersal commands had been left and after force had been applied. The tear gas, I think, was used on the crowd in that case. The evidence was that photojournalist had already left. Photojournalist came back with processors later that night. And at that point, one of the officers thought that this person was part of the protester crowd, and the court concluded in that case, well, there really isn't an — is it really a question of fact whether or not that photojournalist was really part of the crowd? Is it really a question of fact whether this particular photojournalist really did anything wrong? Those are not the facts of our case. We've got evidence all over the place of all the crimes he's committing, multiple, including, I would posit, are felony crimes. He posed a threat to officers. And I see I'm out of time, Your Honors. Thank you. Ms. Barkel. Thank you, Your Honors. May it please the Court. My name is Jane Sportello, and I'm here on behalf of State Defendant Benjamin Kennelly. I'm just going to focus today on the failure to intervene claims against Kennelly which were dismissed. Even if this Court would reverse on Mitchell's excessive force claim, which it should not, the dismissal of the failure to intervene claims against Kennelly should still be affirmed. This Court may affirm on any ground supported by the record. And here the record is entirely undisputed that Kennelly was nowhere near the scene when Mitchell was injured. He was 100 yards away behind a concrete barrier too high to see over. Unlike the assertions in plaintiff's complaint, Kennelly never directed any officer to use force against individual protesters. He had no awareness of the plan to arrest Mitchell. He had no awareness of any plan to use force against Mitchell. This is all entirely undisputed. We have the testimony of the officers who used the force explaining that it didn't come from Kennelly. This is just a really clear undisputed record on the question of failure to intervene. In Kennelly's distance from the scene, not only does it, of course, preclude any ability he had to intervene in the force that was happening, it precludes his knowledge of any constitutional force. Because, again, under the Graham factors, whether forces... What was the intervention theory? You know, Your Honor? If he was so far away, what was the failure to intervene claim factually? Factually, they had claimed that Kennelly was directing officers to deploy less lethal force at Mitchell. That is just resoundingly refuted by all of the discovery in this. Okay, but that's different than he wasn't there. Correct. I thought it was probably that he was directing. If you, from a distance, direct your subordinates, can that be a failure to intervene? Well, it's kind of a stretch conceptually, but I don't say that it's legally impossible. Yes, that could be possible, right, if somehow he was directing them or he had given directions ahead of time. He had directed, and they were carrying out prior directions. And that didn't happen. Looking at Mitchell's claims here, looking at his arguments in the reply, all he can come up with is that, you know, Kennelly did not instruct the officers that they were forbidden from deploying less lethal weapons, right? He didn't tell them to lay down their bean bag rounds, and that's true. He didn't. That's not sufficient to get a failure to intervene claim. And also, Kennelly did send officers south of the bridge to make arrests. But again, officers are allowed to make arrests even for misdemeanors. That's not enough to get the failure to intervene on Kennelly. And just, you know, and kind of going back to the question of excessive force, Kennelly and the other officers had tried to negotiate with the protesters for the five preceding hours, trying to de-escalate this before sending anybody to make arrests. They didn't have to do that under the Constitution. They waited until Mitchell was fleeing, the protesters were fleeing and returning, before they applied that force at all. I see I am out of time. Thank you very much, Your Honors. Thank you. Yes, thank you. Three brief points. My theme is, at most, what you heard are fact questions for the jury. As to the serious crimes analysis, as I stated in the opening, Peele and Welk didn't think he was committing serious crimes. And Judge Smith, you're right that, at most, this is a jury question. As to fleeing and evading arrest, I heard that a shield could be, you know, could meet this prong. But, again, this is, at most, fact questions for the jury. But under this Court's case law, you need active physical resistance for this prong to be met. And in leaders, this Court said that the plaintiff's turning his body away could be seen by a jury as an attempt to shield himself, not as an attempt to flee. I think that's exactly the situation we're in. Mr. Mitchell did testify, though, that he was, when he left the line, it was in an attempt to get out of range of the firing. So, again, this was about his own safety, not about fleeing. Just briefly, to Connelly, the District Court didn't address the merits of that claim at all because it said that there was no Fourth Amendment violation. And so the failure to intervene claim and the Monell claim, therefore, you know, failed on the merits. So on that, I would just say this Court doesn't need to analyze it, but we did put a lot of material in our reply brief should this Court want to reach the issue. In all, we would ask the Court to reverse. Thank you.